The TRAVELERS INSURANCE COMPANY,
Appellant,

v.

Johnnie SMITH, Appellee.

No. 7924.

Court of Civil Appeals of Texas.

Texarkana.

Nov. 12, 1968.

Rehearing Denied Dec. 3, 1968.

Victor Hlavinka, Atchley, Russell, Hutchinson & Waldrop, Texarkana, for appellant.

Harry Friedman, Harkness, Friedman & Kusin, Texarkana, for appellee.

CHADICK, Chief Justice.

There is uncontradicted evidence that the injured workman, Johnnie Smith, Jr., was injured in the course of his employment. At its minimum the injury produced total disability for a time and by aggravation of pre-existing disease permanent disability of 15%, 10% attributable to pre-existing disease and 5% to the injury. By answer to special issue No. 4, the jury found Johnnie Smith, Jr., to be totally and permanently disabled. The appellant's four points of error denounced the jury's verdict on the issue as unjustified on four different grounds, to-wit:

1. The evidence is insufficient to support the verdict;

2. The undisputed evidence shows the workman's injury does not prevent him from performing the usual tasks of a workman;

3. The verdict is against the overwhelming weight and preponderance of the evidence; and

4. The verdict is the result of the jury's passion, prejudice, or improper motive.

The four points have been grouped for discussion and argument in appellant's brief.

Points of error one and two will be overruled without stating or discussing the facts and circumstances found in the record. Careful examination of the proof satisfies the court that there is evidence of sufficient probative value to support the verdict. Neither is a conclusion justified that undisputed evidence shows the workman's ability is not impaired to perform work of the nature he was doing when injured. On the other hand the evidence in all of its complexity will be analyzed and discussed in an effort to resolve the issues presented by the third and fourth points of error. It is not practical to reproduce the evidence in full, and any endeavor to condense and summarize almost necessarily omits or distorts some important aspects of it; the best that can be done is to strive toward a balanced even handed account.

For thirteen years before he was injured, Johnnie Smith, Jr., worked for International Creosote Company. He did general labor in the company's yard, but loading and unloading treated and untreated poles (referred to in the record at one place as telephone poles) was his principal duty. The poles were lifted and moved by a derrick machine, "but we had to handle them too, with a canthook and that was mostly my job that I did", Smith testified. He was injured June 23, 1967. After hospitalization and treatment the company doctor approved his return to work. He then turned to his own doctor and received additional treatment and "began to feel all right", and decided to seek suitable employment elsewhere.

Preliminary to discussion of the evidence the law pertaining to disability or incapacity—the terms are used interchangeably in Workmen's Compensation cases—will be noticed, as it dictates the scope of necessary review. Incapacity is incurred by a workman when his injury prevents him from performing the usual tasks of his job. Total incapacity occurs when a workman is disabled by injury to such extent he can not procure and retain employment at labor of the class he was performing when injured; the term does not imply absolute physical inability to perform any kind of labor. Texas Employers' Ins. Ass'n v. Mallard, 143 Tex. 77, 182 S.W.2d 1000 (1944). Partial incapacity occurs when injury disables a workman to perform part of the usual tasks of his job, though such disablement

does not prevent him from procuring and retaining employment reasonably suitable to his physical condition and ability to work, or when because of injury he is only able to perform labor of a less remunerative class than he performed before injury, and as a consequence he suffers a depression or reduction in his earning capacity. Southern Underwriters v. Schoolcraft, 138 Tex. 323, 158 S.W.2d 991 (1942).

The record contains testimony that would sustain a conclusion that much of the time after injury Smith was in pain, but that he was determined to labor at the best job he could secure, so long as the injury or pain from it did not physically prevent him from doing so. That there were periods of remission from pain is equally well-footed in the record. He felt able to work and did work a greater part of the time between injury and trial. Injury was on June 23, 1967, on August 15 next he began work for a different employer doing, in his opinion, lighter labor than that required on the job where injured. Near the end of the second period of employment, while mopping a floor he had an episode of intensive pain that caused him to lay off from work. The length of time off is not shown, inferentially it was a few days. He reported his inability to work to his employer and supported it with a certificate from his doctor. When he returned to his job November 30, 1967, he was terminated, but not because of inability to perform the task of his job. Not finding employment immediately, he applied for and was awarded weekly unemployment compensation. In securing unemployment benefits he represented that he was ready, able and willing to work at employment for which he qualified. On January 12, 1968, he took employment with Divco-Wayne as a material handler. The work required manual labor and consisted of unloading from box cars such material as plumbing fittings, windows, insulation, paneling, nails, lumber, sofas, bedding, and chairs. Occasionally he worked overtime. He was thus employed at trial time. His foreman considered him an able, competent employee and was well satisfied with his work performance.

Four doctors examined Smith after his injury and before trial. The International Creosote Company's doctor examined him the day after injury; his own physician after the company doctor discharged him. The other doctors, one for Day & Zimmermann and the other for Divco-Wayne, conducted pre-employment physical examinations prior to Smith's employment by the respective companies. The International Creosote Company doctor testified. He assessed permanent disability after injury at 15%, 10% attributable to pre-existing disease, and 5% to injury. Smith's personal physician did not testify and his findings are not shown by the record. Though the other two doctors were not called either, the evidence shows Smith was approved as physically able to perform general labor by each of them at the time of their respective examinations prior to employment.

Smith's physical condition at the time and since he took employment with Divco-Wayne is reflected by this extract from his testimony:

"A. Well, I wasn't just able to work, but I had to do something. I mean I didn't want to see my family lay up there and suffering, and people calling me for my bills and things. I had to try to get out and do something. Q. Now you did go to work for Divco-Wayne in January of this year, just a few months ago. A. Right. Q. Now tell the jury what type of work you are doing at Divco-Wayne. A. Well, Mr. Beard is here. Type work we done was material handling. Q. Now what do you mean by material handling? What is that? A. That is unloading lumber, and unloading furniture, and work like that. Q. All right, now since you have been working there, has your

back been bothering you any? A. No, not since I have been working on that job. But when I come home, get off from work, it goes to paining me; I can't get up. I don't have—just almost don't let me make it. Q. Now when you said no, you meant you hadn't been hurt on the job again? Is this * * * A. That's what I'm talking about. I haven't been hurt no more, but I'm still suffering with it. That's what I mean. Q. Okay. Now is this work that you're doing there now not quite as heavy as what you were doing at the Creosote out there, or is it about the same weight work? A. It's not as heavy as that creosote work. Q. Okay, now tell me how this has been affecting you at night. How did you feel last night, for instance? A. Oh, I felt bad last night. I was hurting all over last night, and my wife, she had to bathe me down, rub me down. I mean the misery that leaves out of my back, it gets in my legs; and go on down, and sometimes it will come up and get in my neck. I mean that's the way that misery runs. I mean whenever it get like that, I mean I just suffer behind it. Some nights I will be asleep and that pain hit me. I wake up; it bothers me like that. I get up in the morning and stoop over, I can't hardly stoop over to tie my shoes up, I mean. Q. All right, and you're going to work as long as your back will let you work? A. As long as it will let me work * * *."

Smith's wife gave a general description of his physical condition in her testimony at the trial, as follows:

Q. Now after he received this injury, and after he went to work out at Day and Zimmermann, was there any change in him? A. Oh, yes, there was change in him. He wasn't, you know, like he used to be * * * Q. Now this is what I mean. Tell the jury how he acted at night when he came home. A. Well, at night he would be restless at night and he couldn't hardly sleep at night. Through the night he be tossing and turning and groaning, but I—he would be asleep but I wouldn't be asleep, but he would be groaning and tossing at night. Sometimes I would wake him up and ask him was he hurting, but he say he didn't know. And so I say, 'You must be hurting, you grunting so.' And so every night mostly he did that. Q. All right, now when he got up in the morning, was he able to * * * A. In the morning he would be awful stiff and so he, you know, ask the baby to tie his shoes up. Q. In other words he couldn't bend over to tie his own shoelaces? A. She tie them up for him most all the mornings. Q. Would he go on and go to work anyway? A. Yes, he did. Q. Okay, and now he is working out at Divco-Wayne. A. Yes. Q. Does he complain at night now, when he comes home from Divco-Wayne? A. Yes, he complains. Last night he had an awful attack, last night. Q. What did you have to do for him last night? A. Rub him down and when he works, at night his neck gets stiff and the muscles in his legs gets stiff and his back hurts, and so we have to rub him down every night mostly. Q. And he's working because he has to work? A. Yes, he have to work. Q. Are there two children at home? A. Yes, I have two, one in high school; take a lot of money to support him. This is his last year in school. Q. What are the ages of the two at home? A. 17 and 8."

■■ When all proof is considered, the great weight and preponderance of the evidence points to a conclusion that the injury to Smith's back left a residue of pain that is neither constant nor totally disabling, though episodes may reoccur the remainder of his life. The injury may have created a condition that is susceptible to aggravation and of such nature as to probably cause a permanent reduction in his earning capacity. After original hospitali-

zation and recuperation he did not let the injury and residual pain prevent him from working for more than a few days between the time of injury and time of trial; in other words, once he returned to the labor market his injury caused him to lose but little work time. The goad of economic necessity might drive a man to labor when not physically able to do so, but such circumstance is evidentiary and must be weighed with other evidence in the case. Likewise, the fact that an injured workman has subsequently done labor of the class he was doing when injured is not conclusive on his capacity to labor, it is only a factor to be considered. 63 Tex.Jur.2d Workmen's Compensation § 462 (1965). The circumstances tend to rebut each other; or the words may explain the action. Neither circumstance appears to be an overriding factor in this particular case. On the evidence as a whole, this court is constrained to find that the jury's answer to special issue No. 4 is against the great weight and preponderance of the evidence. Appellant's third point of error is sustained.

The fourth point of error is overruled, as a finding that the jury was influenced by an improper motive of any description has no basis in the record. The jury had before it evidence that showed an upright, honest and worthy black man had received a severe and painful injury and was permanently disabled to some extent. It could very well have been impressed with the sincerity of his professed determination to work and support himself and his family, and may have wished to reward him because of this evidence of his courage, self-reliance, personal responsibility, and good citizenship, and have been moved to be more generous than the facts warranted. Nevertheless, such an appraisal of the jury's motive is conjectural and may not influence disposition of the case.

The judgment of the trial court is reversed and the cause remanded.